# No. 24-1636

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

**JOSE FRANCISCO DELGADO CORO, MARIA LUZMILA SISA SISA, ILDS, AYDS,**

*Petitioners,*

v.

**PAMELA BONDI,**
**United States Attorney General,**

*Respondent.*

## ON PETITION FOR REVIEW OF A FINAL ORDER
## OF THE BOARD OF IMMIGRATION APPEALS
### Agency Nos. A216-986-483/484/485/486

## BRIEF FOR RESPONDENT

**YAAKOV ROTH**
**Acting Assistant Attorney General**
**Civil Division**

**BENJAMIN MARK MOSS**
**Senior Litigation Counsel**

**RACHEL L. BROWNING**
**Senior Trial Attorney**
**Office of Immigration Litigation**
**Civil Division**
**U.S. Department of Justice**
**P.O. Box 878, Ben Franklin Station**
**Washington, D.C. 20044**

# **TABLE OF CONTENTS**

STATEMENT OF JURISDICTION ........................................................ 1

STATEMENT OF THE ISSUES ........................................................... 2

STATEMENT OF THE CASE .............................................................. 2

    I.    Initiation of removal proceedings........................................ 2

        A.    Petitioners' written declaration ................................ 3

        B.    Petitioners' testimony………………………………………..7

    III.    The agency decisions ...................................................11

SUMMARY OF THE ARGUMENT ...................................................15

ARGUMENT.................................................................................16

    I.    Scope and standard of review...........................................16

    II.    Relevant law and burdens of proof....................................17

    III.    Substantial evidence supports the agency's conclusion that could safely relocate in Ecuador to avoid future persecution and that it was reasonable for them to do so…………………………………………...19

    IV.    Substantial evidence further supports the agency's denial of humanitarian asylum…………………………………………………23

CONCLUSION ..............................................................................28

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

## Cases

*Arango-Aradondo v. INS*,
13 F.3d 610 (2d Cir. 1994) ...................................................17

*Ascencio-Rodriguez v. Holder*,
595 F.3d 105 (2d Cir. 2010) .................................................17

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966) ............................................................17

*Garland v. Ming Dai*,
593 U.S. 357 (2021) ............................................................16

*Gautam v. Barr*,
832 F. App'x 740 (2d Cir. 2020) ...............................20, passim

*Hoxhallari v. Gonzales*,
468 F.3d 179 (2d Cir. 2006) ...........................................25, 26

*INS v. Cardoza- Fonseca*,
480 U.S. 421 (1987) ......................................................17, 18

*INS v. Elias-Zacarias*,
502 U.S. 478 (1992) ......................................................16, 17

*INS v. Stevic*,
467 U.S. 407 (1984) ............................................................18

*Jalloh v. Gonzales*,
498 F.3d 148 (2d Cir. 2007) ...........................24, 25, 26, 27

*Khouzam v. Ashcroft*,
361 F.3d 161 (2d Cir. 2004) .................................................18

*Kone v. Holder*,
596 F.3d 141 (2d Cir. 2010) .................................................26

*Manning v. Barr*,
    954 F.3d 477 (2d Cir. 2020) ...............................................................19

*Melgar de Torres v. Reno*,
    191 F.3d 307 (2d Cir. 1999) ...............................................................21

*Mu Xiang Lin v. U.S. Dep't of Justice*,
    432 F.3d 156 (2d Cir. 2005) ...............................................................18

*Norton v. Sam's Club*,
    145 F.3d 114 (2d Cir. 1998) ...............................................................27

*Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*,
    512 F. Supp. 3d 966 (N.D. Cal. 2021) ...............................................18

*Qing Lin v. Gonzales*,
    245 F. App'x 69 (2d Cir. 2007) .........................................................21

*Shunfu Li v. Mukasey*,
    529 F.3d 141 (2d Cir. 2008) ...............................................................16

*Singh v. Barr*,
    790 F. App'x 332 (2d Cir. 2020) .......................................................23

*Singh v. Sessions*,
    740 F. App'x 8 (2d Cir. 2018) ...........................................................25

*Steevenez v. Gonzales*,
    476 F.3d 114 (2d Cir. 2007) ...............................................................23

*Surinder Singh v. BIA*,
    435 F.3d 216 (2d Cir. 2006) .......................................... 16, 19, 20, 23

*Thapachhetri v. Sessions*,
    690 F. App'x 726 (2d Cir. 2017) .......................................................25

*Ullah v. Barr*,
    830 F. App'x 684 (2d Cir. 2020) ..................................................21, 23

iii

*Wang v. Ashcroft,*
   320 F.3d 130 (2d Cir. 2003) ...................................................................18

*Yu Sheng Zhang v. U.S. Dep't of Justice,*
   362 F.3d 155 (2d Cir. 2004) ...................................................................16

*Yueqing Zhang v. Gonzales,*
   426 F.3d 540 (2d Cir. 2005) ...................................................................27

## Administrative Decisions

*Matter of Chen,*
   20 I. & N. Dec. 16, (BIA 1989) ...........................................................24

*Matter of L-S-,*
   25 I. & N. Dec.  (BIA 2012) ...............................................13, 14, 24

*Matter of M-Z-M-R-,*
   26 I. & N. Dec. 28 (BIA 2012) ...........................................................19

*Matter of N-M-A-,*
   22 I. & N. Dec. 312 (BIA 1998) ...........................................................28

## Statutes

### Immigration and Nationality of 1952, as amended:

Section 101(a)(42),
   8 U.S.C. § 1158(a)(42) ...........................................................................17

Section 208(b)(1)(A),
   8 U.S.C. § 1158(b)(1)(A)..........................................................................17

Section 212(a)(6)(A)(i),
   8 U.S.C. § 1182(a)(6)(A)(i) ................................................................... 3

Section 241(b)(3)(A),
   8 U.S.C. § 1231(b)(3)(A)..........................................................................18

Section 242,
   8 U.S.C. § 1252 ................................................................................... 1

iv

Section 242(b)(1),
8 U.S.C. § 1252(b)(1) .................................................................. 1

Section 242(b)(2),
8 U.S.C. § 1252(b)(2) .................................................................. 2

Section 242(b)(4)(B),
8 U.S.C. § 1252(b)(4)(B) .............................................................16

## Other Statutes

28 U.S.C. § 41 ...............................................................................2, 3

## Regulations

8 C.F.R. § 1003.1(b)(3) ................................................................. 1

8 C.F.R. § 1208.13(b)(1) ...............................................................19

8 C.F.R. § 1208.13(b)(1)(i)(B) .......................................................19

8 C.F.R. § 1208.13(b)(1)(i)(B)(ii) ..................................................20

8 C.F.R. § 1208.13(b)(1)(iii)(A) .....................................................24

8 C.F.R. § 1208.13(b)(1)(iii)(B).................................................24, 26

8 C.F.R. § 1208.13(b)(3) ...............................................................20

8 C.F.R. §§ 1208.16 ......................................................................18

8 C.F.R. § 1208.16(b) ..............................................................18, 23

8 C.F.R. § 1208.16(b)(1)(i)(B) .......................................................19

8 C.F.R. § 1208.16(b)(3)(i) ............................................................19

8 C.F.R. § 1208.16(c)(2) ...............................................................18

8 C.F.R. § 1208.16(c)(3) ...............................................................19

8 C.F.R. § 1208.18 ..................................................................................... 18

8 C.F.R. § 1208.18(a)(1) ........................................................................... 18

8 C.F.R. § 1239.1(a) .................................................................................. 3

8 C.F.R. § 1240.15 .................................................................................... 1

## STATEMENT OF JURISDICTION

In this immigration case, Petitioners seek review of a May 29, 2024 final order of the Board of Immigration Appeals ("Board"), in which it affirmed, without opinion, the immigration judge's decision denying their applications for asylum, withholding of removal and protection under the regulations implementing the Convention Against Torture ("CAT").[1] Certified Administrative Record ("AR") 3 (Board's decision), 34-48 (immigration judge's decision). The Board's jurisdiction arose under 8 C.F.R. §§ 1003.1(b)(3) and 1240.15 (2022), which confer appellate jurisdiction on the Board over the decisions of immigration judges in removal cases.

This Court's jurisdiction to review a final order of removal is governed by 8 U.S.C. § 1252. To seek review, an individual under a final order of removal must file a petition for review no later than 30 days after the date on which the Board issued that order. 8 U.S.C. § 1252(b)(1). Here, the Board issued the final order of removal on May 29, 2024, AR 3, and Petitioners timely filed this petition for review on June 21, 2024. Venue is proper in this Court because the immigration court proceedings concluded in New York, New York. AR 34 (immigration judge's decision); *see* 8 U.S.C. § 1252(b)(2); *see also* 28 U.S.C. § 41.

---

[1] This case involves a family comprised of Jose Francisco Delgado Coro ("Delgado Coro"), his wife, Maria Luzmila Sisa Sisa ("Sisa Sisa"), and their two minor children, herein collectively referred to as "Petitioners." *See* AR 34-35.

## STATEMENT OF THE ISSUES

I.  Whether substantial evidence supports the agency's denial of asylum, withholding of removal, and CAT protection, where the government rebutted Petitioners' presumption of future persecution by showing that it was safe and reasonable for Petitioners to relocate within Ecuador to avoid harm in the future.

II. Whether substantial evidence further supports the agency's denial of humanitarian asylum, where, in accordance with the Board's criteria and the case law of this Court, the harm Petitioners suffered was not sufficiently severe to qualify for such discretionary relief, and Petitioners failed to show a reasonable possibility of facing other serious harm in Ecuador.

## STATEMENT OF THE CASE

### I.  Initiation of removal proceedings

Petitioners are natives and citizens of Ecuador, who entered the United States at or near San Luis, Arizona, on or about June 19, 2021, without being admitted or paroled after inspection by an immigration officer.  AR 615, 992, 1367, 1742; *see* AR 823, 825, 827, 830, 834 (identity documents).  On November 12, 2021, the Department of Homeland Security ("DHS") served Petitioners with Notices to Appear ("NTA"), charging them with removability under 8 U.S.C.

§ 1182(a)(6)(A)(i), as non-citizens present in the United States without having been admitted or paroled. AR 615-16, 992-93, 1367-68, 1742-43. DHS subsequently filed the NTAs in immigration court to initiate removal proceedings. *Id.*; *see* 8 C.F.R. § 1239.1(a).

On March 25, 2022, Petitioners, through counsel, admitted the factual allegations contained in the NTAs and conceded the charges of removability. *See* AR 102-04. As relief from removal, Petitioners sought asylum, withholding of removal, and CAT protection. AR 104; *see* AR 370-73 (Delgado Coro's written declaration), 392-402 (Sisa Sisa's written declaration) 782-90 (Petitioners' I-589 application for asylum).

## II. Evidence before the immigration judge

### A. Petitioners' written declaration

In his written declaration, Delgado Coro stated that he feared returning to Ecuador because of government corruption relating to the activities of paramilitary gangs and the harm he and his wife experienced due to their membership in the Indigenous Nationality Confederation of Ecuador ("CONAIE"). AR 371. He recounted being targeted by a drug trafficking organization known as "Los Lagartos," who extorted him and his wife while they were working as street vendors. *Id.* He explained that, because his family are indigenous, they have "no rights," and the government will not protect them from criminal harm. *Id.* He

3

stated that Petitioners were regularly threatened by groups of armed men who walked around in uniform even though they were not police officers. *Id.* These men would harass them and demand a "daily fee" from them. *Id.* The groups "assault[ed] [his] wife," and Petitioners' vendor cart was stolen multiple times between 2007 and 2019. AR 371-72.

In 2018, Petitioners began receiving "disturbing and threatening text messages from unknown numbers," by individuals requesting large sums of money and threatening to kill them if they did not comply. AR 372. They also received "gory and horrific videos of people being beheaded by masked men," but when they asked for assistance from the police, the authorities refused to help. *Id.* In October 2019, Petitioners participated in a national strike as members of CONAIE and traveled to the town of Guayaquil to protest with other indigenous people. AR 372. The protest lasted eleven days, during which people were injured or killed, and at least 1300 protesters were arrested. *Id.* Members of the police fired tear gas in Petitioners' direction even though the protest was "peaceful" and "nonviolent." *Id.* Petitioners feared being persecuted or possibly killed by Los Lagartos. *Id.*

Sisa Sisa also submitted a written declaration providing additional details regarding Petitioners' membership in CONAIE, the harm they suffered due to their participation in certain political activities, and their experiences being harassed and extorted by Los Lagartos while operating their vendor cart. *See* AR 392-402. She

4

explained that the Ecuadoran police and government officials are "corrupt" and are known to "work closely with criminal organizations." AR 393. She noted that Los Lagartos members dress in military-style uniforms, drive motorcycles and large trucks, and force business owners to pay a daily fee to sell their goods. AR 394. She further explained that Los Lagartos is active throughout Ecuador and that their main base is located in Guayaquil. AR 395. She reiterated that Petitioners were targeted by Los Lagartos due to their indigenous ethnicity, which she explained is apparent by their native dress, and that Los Lagartos members harassed and threatened them, demanded a daily fee, stole their vendor cart, and called them derogatory names. AR 395-96.

Sisa Sisa further recalled a violent incident during which she was selling products from Petitioners' cart, and carrying her four-month-old son on her back, when multiple Los Lagartos members demanded money and pushed her to the ground because she could not pay their fee. AR 396-97. As a result, her son hit his head on the pavement and began to bleed from his mouth. AR 397. The men stole the cart and drove away, yelling racial slurs at them as they lay on the ground. *Id.* Her son now has a scar on his face from the assault because she did not have money to pay for him to get stitches. AR 397. She went to the Guayaquil police to report the incident, but the officers would not take a report and instead told her to move to a different part of the city to avoid the perpetrators. *Id.* The police also

"ridicule[ed]" her native dress and accent and told her to go "back to the 'paramo,'" where other indigenous groups live.  AR 397-98.

Sisa Sisa stated that, in June 2019, she received an anonymous message directing her to deposit $800 in a nearby dumpster or else the caller would kidnap and kill her son the next day.  AR 398.  She explained that, because Petitioners did not have $800 and knew that the police would not help them, they decided to take a five-hour bus ride to the town of Chimborazo to stay with her husband's family. *Id.*  They did not return to Guayaquil because they feared that Los Lagartos members would find and extort them again, and they had no faith that the local police would protect them.  AR 399.

Referring to the national strike that Petitioners joined from October 3 – 13, 2019, Sisa Sisa stated that the point was to "paralyz[e] major cities throughout Ecuador by protests, blockades, and occupation of public spaces and government buildings." *Id.*  She noted that numerous people were killed, injured, or arrested, and that the police threw tear gas cannisters at the crowds during the strike.  AR 399-400.  Because the Ecuadoran government and police are "corrupt and violent towards Indigenous people and unable and unwilling to protect [them]," Petitioners decided to come to the United States for safety. *Id.*

6

**B. Petitioners' testimony**

In the individual hearing held on November 22, 2022, counsel for Petitioners explained that Petitioners' asylum and withholding of removal applications were based on political opinion – specifically, their objection to the Ecuadoran government's treatment of indigenous people and participation in government protests in 2017 – their indigenous ethnicity, and their membership in a particular social group of "businessowners." AR 146, 148. Counsel stated that Petitioner Sisa Sisa's application would be based additionally on her membership in the proposed particular social group of "gang-targeted vulnerable female indigenous businesswomen." AR 147.

Sisa Sisa testified that she and her husband are indigenous Quichua and that they used to belong to a group that advocated for the rights of indigenous people. AR 154-55. She stated that in Ecuador she sold goods from a street cart beginning in 2007. AR 157. She explained that the municipal police prevented her from selling in the street by taking her goods away from her. AR 158. She also testified that she received threatening messages from "thieves," warning her that they would kill her children if she did not pay them a certain amount of money. *Id.* Asked whether these people ever came to her cart, Sisa Sisa repeated that they told her she had to pay them. AR 158-59. She reiterated that they threatened to hurt her and her children and stole from her. AR 159. She said that the men showed up

once a month to steal from her, wore "military kind of clothing," covered their faces, and carried weapons. AR 159-60. Sisa Sisa testified that the weapons were visible and that no one intervened out of fear. AR 161. She said that the men told her to "go back to the hills" and made other racist and derogatory statements to her because she was indigenous. AR 162. Asked if the municipal police ever responded to these men, Sisa Sisa testified that the police "never did anything to be against them" and were instead "in favor" of their actions. AR 161-62.

Sisa Sisa further testified that in 2019 she suffered a sudden attack by these men, who knocked her and her child to the ground, causing her child to lose a tooth. AR 163. She explained that the men initially approached her wanting to take her money and, when she refused to pay them, they pushed her to the ground while she was carrying her infant son, causing him to bleed from the mouth and lose a tooth. AR 163-64. She said that there were five men and that, after seeing her and her son on the ground, they ran away. AR 164. She testified that her husband was there and was "kicked and . . . hit with a stick," resulting in what she thought was an injury to his eye. AR 165. She clarified that her son was seven months old at the time and lost his only front tooth. *Id.* She reported the men to the police, but the police did not do anything for them. AR 166. Sisa Sisa testified that, whenever the police saw her in the streets in her "distinctive clothing," they would tell her, "I hope you get robbed." *Id.* Asked whether the police or thieves

8

ever referred to her Quichua ethnicity, Sisa Sisa said that they used to say,
"Indians, go to your mountain. You stink." AR 167.

Regarding the threatening messages she received over the telephone, Sisa
Sisa indicated that she was threatened twenty times. AR 167. She said that they
demanded $800 and said that they would stop threatening her and her child if she
left the money in a specific place. *Id.* Sisa Sisa testified that she did not have this
amount of money and that she did not report the threats to the police because "they
[would not] do anything." AR 168. Instead, the police told her and her husband to
go back to Chimborazo, where her family was originally from. AR 168-69. She
explained that they could not stay in Chimborazo because there was "ash" in the
air, their livestock was dying, and her children were becoming sick, so they
decided to move to Guayaquil. AR 169, 173.

Sisa Sisa further testified that she and her husband participated in protests in
2009 organized by a group called CONAIE, who represents the Quichua people.
AR 174. She stated that during the protest, police officers threw cannisters of tear
gas at them, and some of the gas hit her in the eye. AR 175-76. She estimated that
between 130 and 160 protesters were killed. AR 177.

During cross-examination, Sisa Sisa testified that she and her husband were
married in Chimborazo and moved to Guayaquil in 2007. AR 183-84. She
indicated that, after her assault in 2019, she and her family moved back to

9

Chimborazo. AR 186-87. She stated that they stayed in Chimborazo for approximately two years, until 2021, when they returned to Guayaquil. AR 188, 199. She confirmed that, while they were living in Chimborazo, they were never threatened by anyone. AR 188-89. Asked if this was true for the entire time between 2007 and 2019 in Guayaquil, she said that she "[had] that issue on and off." AR 193. She did not know the identities of the individuals who demanded the $800, and she did not report the incident to the police. AR 194. She admitted that she only reported one of the incidents to the police and explained that it was because, in her country, no one helps the indigenous Runas. AR 195.

Sisa Sisa confirmed that her brothers and sisters all live in Chimborazo and that she communicates with them regularly. AR 203. She said that her husband's siblings live in Guayaquil and that they are aware of the problems her family had there. AR 204. She stated that her husband's siblings did not submit letters to support their asylum applications because they are not very responsive. AR 205. She did not know whether any of her husband's family members (who are also indigenous) had experienced any problems in Guayaquil. AR 205-06. She testified that other members of her family participate in the CONAIE indigenous group and likewise have not been "allowed to work in the streets" because they are indigenous. AR 206. When the DHS attorney asked whether the family could live in Chimborazo upon her return to Ecuador, Sisa Sisa said, "[y]es." AR 207. She

10

affirmed that during the two years she and her family lived in Chimborazo, they did not receive any threats and were "safe" but said that they could not live there because there was little work in farming production.  AR 207-08.  Upon further questioning from the immigration judge, Sisa Sisa explained that, while her family in Chimborazo makes a living farming and raising cattle, farming there is difficult due to falling ash from nearby active volcanos that makes the livestock sick.  AR 220.  She stated that it would be difficult to sell from her food cart in Chimborazo because the people there would not be able to afford to buy from them.  AR 221.  She admitted that she had not tried to live anywhere else because she believed Guayaquil was the best location to run her business.  AR 222.

## III.    The agency decisions

On May 16, 2022, the immigration judge issued an oral decision denying Petitioners' applications.  AR 34-48.  The immigration judge found that the harm Petitioners experienced in Ecuador between 2008 and 2019 rose to the level of persecution and that the harm perpetrated by gang members was, at least in part, on account of their indigenous race.  AR 38-39.  The judge further determined that the harm was perpetrated by private individuals whom the authorities were unwilling to control.[2]  AR 39.  Accordingly, because Petitioners established past persecution,

---

[2] The immigration judge found that the harm Petitioners experienced during the October 2019 protest – namely tear gas sprayed at the crowd of protestors – was

(Continued . . . )

the immigration judge determined that they were entitled to a presumption of future persecution.  AR 40.

Ultimately, however, the immigration judge denied Petitioners' asylum claim based on the determination that the government met its burden of rebutting the presumption of future persecution by establishing that Petitioners could relocate internally in Ecuador and that it was reasonable for them to do so under the circumstances.  AR 40-41.  Considering all of the relevant factors and analyzing Petitioners' testimony on cross examination, the immigration judge explained that Petitioners had relocated to Chimborazo for nearly two years and did not experience any threats or harm while living there.  AR 42.  The judge recalled Sisa Sisa's testimony that, although the ash from nearby volcanoes made life and work difficult in Chimborazo, she indicated that several family members live and work there and admitted that it would be safe for her family to live there as well.  AR 42.  The judge further pointed out that Petitioners were never targeted by Los Lagartos while in Chimborazo, nor were they in hiding there.  AR 43.

The immigration judge also acknowledged high levels of crime in Ecuador generally but found that Petitioners are young and healthy and able to work and support themselves while living with family safely in Chimborazo.  AR 43.  The

---

not persecution on account of their race but rather was the government's attempt to subdue the protestors and keep them from paralyzing the city.  AR 39-40.

judge further referenced the country conditions evidence documenting discrimination against indigenous communities but reiterated that Petitioners lived for two years in a community where they were not harmed, and that Ecuador had made progress in addressing its struggles with the indigenous communities. AR 44. The immigration judge thus determined that the government rebutted the presumption of future persecution by establishing by a preponderance of the evidence that Petitioners could relocate internally to avoid future harm. *Id.*

Considering whether Petitioners warranted humanitarian asylum, the immigration judge found that, while Petitioners experienced harm constituting past persecution, it did not amount to "'an atrocious form of persecution' that "caused 'long-lasting effects'" to Petitioners. AR 45 (quoting *Matter of L-S-*, 25 I. & N. Dec. 205, 710 (BIA 2012)). The judge found that Sisa Sisa's experience of being robbed, pushed, shoved, and threatened "came nowhere near the levels [of persecution]" that the Board had determined rose to the level of "atrocious" persecution. *Id.* The judge further explained that the evidence did not demonstrate that Petitioners would face "other serious harm," reiterating that Petitioners lived in Chimborazo for two years without suffering further harm, and that, under the totality of the circumstances and evidence presented, Petitioners had not shown a reasonable possibility of facing other serious harm in the future. AR 45-46.

13

Because Petitioners failed to meet their burdens of proof for asylum, the immigration judge determined that they necessarily failed to meet the higher burden of a clear probability of persecution for withholding of removal. AR 46. The judge also found that, although there was evidence of human rights violations and discrimination against the indigenous community in Ecuador, Petitioners had not established a clear probability of suffering torture by or with the consent or acquiescence of government officials in Ecuador. AR 47-48. The judge again emphasized Petitioners' ability to live in Chimborazo safely for two years, which "undermine[d] substantially" the chance that they would face torture in the future. AR 48. Based on the foregoing, the immigration judge denied Petitioners' applications for asylum, withholding of removal, and CAT protection and ordered their removal to Ecuador. *Id.*

Petitioners appealed to the Board, challenging the immigration judge's findings that they could safely relocate within Ecuador to avoid future persecution and that the harm they suffered was not sufficiently severe to warrant the discretionary relief of humanitarian asylum. AR 7-9. On May 29, 2024, the Board adopted and affirmed without opinion the immigration judge's decision and dismissed the appeal. AR 3. This petition for review followed.

## SUMMARY OF THE ARGUMENT

The Court should deny the petition for review. No reasonable adjudicator would be compelled to conclude, contrary to the agency, that Petitioners met their burdens of proof for asylum-related relief and protection from removal, where substantial evidence supports the immigration judge's conclusion that the government rebutted the presumption of future persecution by establishing that it was safe and reasonable for Petitioners to relocate within Ecuador to avoid harm in the future. Indeed, Petitioners do not dispute that, after being threatened and harmed for a number of years in the town of Guayaquil, they moved to Chimborazo and lived and worked there for nearly two years without being harmed or even threatened by the gangs who had harmed them in the past. Moreover, Petitioners have multiple family members who continue to live safely in Chimborazo. Accordingly, the record does not compel the reversal of the agency's conclusion that Petitioners can safely relocate within Ecuador to avoid future harm and that, under the circumstances, it is reasonable for them to do so.

Substantial evidence further supports the agency's denial of humanitarian asylum. Considering the Board's criteria for humanitarian asylum and this Court's case law, Petitioners have not shown the requisite severity of past persecution, nor have they claimed to suffer from long-lasting physical or mental issues as a result of the harm they experienced. Importantly, as the immigration judge determined,

15

Petitioners were able to live safely in Chimborazo for nearly two years, such that they have failed to show a reasonable possibility of facing other serious harm in the future. Accordingly, this Court should not disturb the agency's decision.

## ARGUMENT

### I. Scope and standard of review

Where, as here, the Board summarily affirms the immigration judge's decision without issuing its own opinion, the Court reviews the decision of the immigration judge "as the final agency determination." *Shunfu Li v. Mukasey*, 529 F.3d 141, 146 (2d Cir. 2008); *see also Yu Sheng Zhang v. U.S. Dep't of Justice*, 362 F.3d 155, 158 (2d Cir. 2004).

The Court reviews administrative findings of fact for substantial evidence. *See* 8 U.S.C. § 1252(b)(4)(B). This includes determinations regarding an individual's possibility and reasonableness of relocating internally in his native country. *See Surinder Singh v. BIA*, 435 F.3d 216, 219 (2d Cir. 2006) (reviewing the agency's relocation finding for substantial evidence). Under this highly deferential standard, administrative findings of fact "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *Garland v. Ming Dai*, 593 U.S. 357, 365 (2021) (pointing to § 1252(b)(4)(B) as "a highly deferential standard" that "carefully circumscribed judicial review of B[oard] decisions" (internal quotation marks omitted)); *INS v.*

16

*Elias-Zacarias*, 502 U.S. 478, 481 (1992) (emphasizing that courts must uphold the agency's conclusion that an applicant is not eligible for relief from removal if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole" (internal quotation marks omitted)).  Accordingly, the possibility of drawing two inconsistent conclusions from the evidence "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (internal citation omitted); *see also Ascencio-Rodriguez v. Holder*, 595 F.3d 105, 110 (2d Cir. 2010); *Arango-Aradondo v. INS*, 13 F.3d 610, 613 (2d Cir. 1994) (holding that the  Court is "not empowered to reweigh the evidence and second guess the [agency's] determination[s].").

## II.     Relevant law and burdens of proof

Pursuant to 8 U.S.C. § 1158(b)(1)(A), the Attorney General may grant asylum to a noncitizen if that individual qualifies as a "refugee."  *See INS v. Cardoza- Fonseca*, 480 U.S. 421, 428 n.5 (1987).  Within the meaning of 8 U.S.C. § 1101(a)(42), an applicant must establish past "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Elias-Zacarias*, 502 U.S. at 481 (internal quotation marks omitted).  Unlike the discretionary grant of asylum, withholding of removal under the statute is mandatory if an applicant proves that her "life or

17

freedom would be threatened in [the] country because of [her] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). The applicant thus bears the burden of proving a "clear probability," i.e., that it is "more likely than not," that she will suffer persecution on account of a protected ground upon return. *INS v. Stevic*, 467 U.S. 407, 429-30 (1984); *Cardoza-Fonseca*, 480 U.S. at 430; 8 C.F.R. § 1208.16(b).[3]

An applicant seeking CAT protection must establish that she is "more likely than not" to be tortured by or with the consent or acquiescence government officials. 8 C.F.R. §§ 1208.16(c)(2), 1208.18(a)(1); *see Khouzam v. Ashcroft*, 361 F.3d 161, 170-71 (2d Cir. 2004). While an applicant seeking such protection need not show a connection between the torture she fears and any statutorily-protected ground, she must show that she faces a particularized risk of torture in her home country. *Mu Xiang Lin v. U.S. Dep't of Justice*, 432 F.3d 156, 159-60 (2d Cir. 2005); *Mu Xiang Wang v. Ashcroft*, 320 F.3d 130, 144 (2d Cir. 2003).

The ability to safely relocate in another part of the country of removal is relevant to asylum, withholding, and CAT protection. The internal relocation

---

[3] Before the Board issued its decision in this case, the Department of Justice amended several regulations, including certain subsections of 8 C.F.R. §§ 1208.16 and 1208.18. As a result of various lawsuits, the 2020 version of 8 C.F.R. § 1208.18 (except subsection (b)(1)) is currently effective, while the current version of 8 C.F.R. § 1208.16 (except subsections (b)(3) and (e)) is operative. *See Pangea Legal Servs. v. U.S. Dep't of Homeland Sec.*, 512 F. Supp. 3d 966, 969-70 (N.D. Cal. 2021).

analysis for asylum and withholding of removal applications focuses on two inquires. *Matter of M-Z-M-R-*, 26 I. & N. Dec. 28, 32 (BIA 2012); *see Singh v. Board of Immigration Appeals*, 435 F.3d 216, 219 (2d Cir. 2006) (citing 8 C.F.R. § 1208.16(b)(1)(i)(B)). First, the agency "must decide whether 'the applicant could avoid future persecution by relocating to another part of the applicant's country of nationality.'" *Matter of M-Z-M-R-*, 26 I. & N. Dec. at 32 (quoting 8 C.F.R. § 1208.13(b)(1)(i)(B)). Second, the agency must evaluate "whether under all the circumstances, it would be reasonable to expect the applicant to do so." *Matter of M-Z-M-R-*, 26 I. & N. Dec. at 34 (quoting 8 C.F.R. § 1208.13(b)(1)(i)(B)); 8 C.F.R. § 1208.16(b)(3)(i). With respect to CAT protection, the agency must conduct an objective analysis of multiple factors, without allocating the burden of proof to either party, to determine whether an applicant could relocate to avoid torture. *Manning v. Barr*, 954 F.3d 477, 488 (2d Cir. 2020) (citing 8 C.F.R. § 1208.16(c)(3)).

## III. Substantial evidence supports the agency's conclusion that Petitioners could safely relocate in Ecuador to avoid future persecution and that it was reasonable for them to do so.

In this case, the immigration judge determined that Petitioners suffered harm amounting to past persecution in part based on their indigenous identities; thus, they benefited from a presumption of a well-founded fear of future persecution. AR 38-40; *see* 8 C.F.R. § 1208.13(b)(1). However, as the judge explained, AR 40-

41, DHS may rebut this presumption if a preponderance of the evidence demonstrates that Petitioners can safely and reasonably relocate within their country of removal. 8 C.F.R. § 1208.13(b)(1)(i)(B), (ii); *see Singh v. BIA*, 435 F.3d 216, 219 (2d Cir. 2006) ("Asylum in the United States is not available to obviate re-location to sanctuary in one's own country."). In deciding whether internal relocation is reasonable, an immigration judge "consider[s] . . . whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties." 8 C.F.R. § 1208.13(b)(3).

Substantial evidence supports the immigration judge's conclusion that Petitioners could avoid future harm by relocating away from Guayaquil to Chimborazo and that relocation would be reasonable. AR 40-44. The immigration judge provided a thorough explanation for this finding, referring to Petitioners' testimony that they left Guayaquil in 2019 and moved to Chimborazo, where they lived through 2021 without experiencing any further harm. AR 42 (Sisa Sisa's acknowledging that she and her family would be safe living in Chimborazo); *see Gautam v. Barr*, 832 F. App'x 740, 743 (2d Cir. 2020) ("Given Gautam's previous ability to live, work, and actively support the NCP in other parts of Nepal, and the lack of evidence that his persecutors were actively looking for him in those areas,

the preponderance of the evidence supports the agency's determination that he could internally relocate."). The immigration judge also noted that multiple relatives of Petitioners live and work in Chimborazo and have not faced harm. *Id.*; *see Qing Lin v. Gonzales*, 245 F. App'x 69, 71 (2d Cir. 2007) (upholding the agency's finding that Lin could safely relocate based on evidence that her mother and brother had relocated and not faced any harm); *c.f. Melgar de Torres v. Reno*, 191 F.3d 307, 313 (2d Cir. 1999) (finding alleged future fear diminished when similarly situated individuals are able to live unharmed in asylum applicant's native country).

The immigration judge recognized that it may be difficult for Petitioners to find work in agriculture in Chimborazo and that crime rates in Ecuador are high but reiterated that Petitioners managed to reside in Chimborazo safely for nearly two years while supporting themselves and were not targeted again by Los Lagartos. AR 42-43; *see Gautam*, 832 F. App'x at 743 (explaining that the persecutors' potential discovery of the applicant's home did not undermine the agency's internal relocation determination, where the applicant continued to live in Kathmandu for four months without incident before fleeing); *Ullah v. Barr*, 830 F. App'x 684, 686 (2d Cir. 2020) (explaining that general arguments about a political party's control over a country, were "undermined" by the petitioner's ability to avoid harm, from a rival political faction, for years). Petitioners acknowledge Sisa

21

Sisa's admission that Chimborazo would be a safe place for them to live; nonetheless, they claim the judge improperly placed the burden on them to show the impossibility of internal relocation. Pet'r Br. at 6-7. This argument is unavailing.

After her initial testimony during direct examination, the DHS attorney asked Sisa Sisa additional follow-up questions on cross examination regarding her family's two-year residence in Chimborazo, and Sisa Sisa confirmed that she and her family did not receive any threats while living there and acknowledged that it would be a "safe" place for them to live. AR 207-08. She further explained that the reason they preferred to live in the United States because of dissatisfaction with the potential farming opportunities in Chimborazo. AR 207. Upon further questioning from the immigration judge, however, she indicated that her relatives farm and raise cattle in Chimborazo, noting that farming is "difficult" due to falling ash from a nearby volcano. AR 220. She confirmed that her relatives were able to earn a living there, but, when asked whether she could sell from her cart in Chimborazo, she testified that the people there could not afford to buy from her.[4] AR 221. Thus, by eliciting testimony from Sisa Sisa that established Petitioners

---

[4] Contrary to Petitioners' contention, Sisa Sisa did not claim to have been robbed while in Chimborazo during redirect examination. Pet'r Br. at 7-8. Rather, she confirmed that the family traveled between the two cities and testified that, after returning to Guayaquil, she ceased selling from her cart because she had not received help in response to past robberies there. AR 251-52.

ability to return to Chimborazo, where they lived safely for two years, DHS met its burden of demonstrating that it was safe and reasonable for Petitioners to relocate within Ecuador to avoid future persecution. *See Gautam*, 832 F. App'x at 743; *Ullah*, 830 F. App'x at 686; *c.f. Singh v. Barr*, 790 F. App'x 332, 333 (2d Cir. 2020) (explaining that a speculative fear of countrywide mistreatment, based on general country conditions, "is insufficient to show that [petitioner] cannot relocate," in the absence of proof the applicant "would be singled out for harm").

Because no record evidence compels the reversal of the agency's internal relocation analysis, this Court should deny the petition for review with respect to Petitioners' claims for asylum, withholding of removal, and CAT protection. *See Singh*, 435 F.3d at 219 (holding that an asylum claim fails if internal relocation is possible); *Steevenez v. Gonzales*, 476 F.3d 114, 117-18 (2d Cir. 2007) ("An alien's ability to relocate safely constitutes a ground, in and of itself, on which an [immigration judge's] denial of withholding of removal may be based. . . ."); *Gautam*, 832 F. App'x at 743-44 ("[T]he agency's determination that [petitioner] could relocate safely is dispositive of his CAT claim."); 8 C.F.R. § 1208.16(c)(3).

## IV.   Substantial evidence further supports the agency's denial of humanitarian asylum.

This Court should deny Petitioners' cursory challenge to the agency's denial of humanitarian asylum because substantial evidence supports the immigration judge's analysis.  AR 44-46.  Humanitarian asylum is available to applicants in the

23

absence of a well-founded future fear of persecution, where they: (1) demonstrate compelling reasons for being unable or unable to return to their home country "arising out of the severity of the past persecution;" or (2) establish a reasonable possibility of suffering "other serious harm" upon removal to their home country. 8 C.F.R. § 1208.13(b)(1)(iii)(A)-(B); *see Matter of L-S-*, 25 I. & N. Dec. at 710-14 (discussing the elements of humanitarian asylum).

Applying this standard, the immigration judge found that Petitioners did not establish compelling reasons for being unable or unwilling to return to Ecuador based on the severity of the past persecution they experienced. AR 45-46; *see* 8 C.F.R. § 1208.13(b)(1)(iii)(A); *Jalloh v. Gonzales*, 498 F.3d 148, 151-52 (2d Cir. 2007) (per curiam); *see also Gautam*, 832 F. App'x at 743. In evaluating the severity of Petitioners' experiences, the judge found that Petitioners' experiences being threatened, robbed, and assaulted did not satisfy the level of severity required, nor did the harm they suffered result in any ongoing physical or psychological problems. AR 45. Indeed, the harm Petitioners suffered was far less severe than those in *Matter of Chen*, 20 I. & N. Dec. 16, (BIA 1989), the Board's seminal humanitarian asylum case, involving an individual who was locked in a room for eight months at the age of eight, "interrogated on a continuing basis[,]" denied medical care, and sent to live in exile for two years—mistreatment that left him physically disabled and suicidal. *Matter of Chen*, 20 I. & N. Dec. at 20.

The harm Petitioners experienced consisted of robberies, threats, and two physical altercations that, while no doubt disturbing and disruptive, were more analogous to (or, in some circumstances, significantly less severe than) the incidents of persecution in cases where this Court has upheld the denial of humanitarian asylum. *See, e.g.*, *Jalloh*, 498 F.3d at 151-52 (explaining that two physical attacks by a militia, including a rape the petitioner's wife and the burning of their home, were insufficient to establish eligibility for humanitarian asylum in the absence of evidence of "long-lasting physical or mental effects"); *Hoxhallari v. Gonzales*, 468 F.3d 179, 184 (2d Cir. 2006) (upholding the denial of humanitarian asylum where the applicant was harassed and beaten on *six* different occasions by police); *Gautam*, 832 F. App'x at 743 ("Guatam's alleged past persecution, which consisted of beatings on two occasions, was not sufficiently severe to justify humanitarian asylum."); *Singh v. Sessions*, 740 F. App'x 8, 9 (2d Cir. 2018) (concluding that substantial evidence supported the denial of humanitarian asylum fails where petitioner "did not allege any continuing physical or psychological harm stemming from his past mistreatment."); *Thapachhetri v. Sessions*, 690 F. App'x 726, 729 (2d Cir. 2017) (upholding the agency's denial of humanitarian asylum where petitioner "suffered injuries to his shoulder, chest, and arms, for which he was treated . . . then discharged within three hours because his "condition improved"). Accordingly, based on this Court's case law, the record evidence does

not compel the conclusion that Petitioners experienced persecution that was sufficiently severe to warrant humanitarian asylum. AR 45-46; *Kone v. Holder*, 596 F.3d 141, 152 (2d Cir. 2010) (holding that a grant of humanitarian asylum "is reserved for atrocious forms of persecution") (internal quotation marks and citation omitted); *see, e.g.*, *Jalloh*, 498 F.3d at 151-52; *Hoxhallari*, 468 F.3d at 184.

In addition, substantial evidence supports the immigration judge's finding that Petitioners failed to demonstrate a likelihood that they would face "other serious harm" in Ecuador justifying a grant of humanitarian asylum. AR 45-46. The regulations make eligible for asylum an applicant who has suffered past persecution and who establishes "a reasonable possibility that he or she may suffer other serious harm upon removal." 8 C.F.R. § 1208.13(b)(1)(iii)(B). "[O]ther serious harm" is defined as "harm that is not inflicted on account of race, religion, nationality, membership in a particular social group, or political opinion, but is so serious that it equals the severity of persecution." 65 Fed. Reg. 76121–01, 76127 (Dec. 6, 2000). Here, as the immigration judge determined, Petitioners neither alleged nor submitted evidence showing a likelihood that they would experience "other serious harm" akin to persecution in Ecuador. AR 46. Importantly, the judge also reiterated that Petitioners successfully relocate to another city (and could do so again in the future) to avoid further harm from the gangs that threatened them. AR 46; *Gautam*, 832 F. App'x at 743 (explaining that the

agency's conclusion that petitioner could relocate to avoid future persecution "applies with equal force to his argument about 'other serious harm'").

In their opening brief, Petitioners do not address the specific criteria for humanitarian asylum – neither the requisite severity of the past persecution, nor the likelihood of experiencing other serious harm – and instead argue simply that their "lifetime of discrimination and persecution" provides them "compelling reasons" for not wanting to return to Ecuador.  Pet'r Br. at 9.  Petitioners therefore have not preserved any argument challenging the Board's application of the relevant factors. But even if the Court considers the matter further.  *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal."); *Yueqing Zhang v. Gonzales*, 426 F.3d 540, 546 n.7 (2d Cir. 2005) (providing that issues not raised in the opening brief are waived).  Accordingly, considering the regulatory language, as well as the case law of the Board and this Court, Petitioners have not shown that the record compels the sole conclusion that they warrant the relief of humanitarian asylum, either due to the severity and long-lasting impact of the harm they experienced, or the likelihood of experiencing other serious harm in the future.  AR 45-46; *see Jalloh*, 498 F.3d at 151 ("in order for an alien to obtain humanitarian asylum he . . . must establish both 'the severe harm and the long-

27

lasting effects of that harm."') (quoting *Matter of N-M-A-*, 22 I. & N. Dec. 312, 326 (BIA 1998)); *see also Gautam*, 832 F. App'x at 743.

## CONCLUSION

For all the foregoing reasons, the Court should deny this petition for review.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
Civil Division

s/Rachel L. Browning
RACHEL L. BROWNING
Senior Trial Attorney

BENJAMIN MARK MOSS
Senior Litigation Counsel

Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, D.C.  20044
(202) 532-4527

April 28, 2025

Attorneys for Respondent

28

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

I hereby certify that:

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6564 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman.

s/Rachel L. Browning
RACHEL L. BROWNING
Senior Trial Attorney

April 28, 2025

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on April 28, 2025, I electronically filed the

foregoing Brief for Respondent with the Clerk of the Court for the United States

Court of Appeals for the Second Circuit by using ACMS.  I certify that all

participants in the case are registered ACMS users, and that service will be

accomplished by ACMS.


s/Rachel L. Browning
RACHEL L. BROWNING
Senior Trial Attorney